Receipt number AUSFCC-9778207

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SLSCO, LTD.

            Plaintiff,

   v.

THE UNITED STATES OF AMERICA,

          Defendant.

Case No. **24-1266C** _____

Judge _____

## COMPLAINT

Plaintiff SLSCO, Ltd., ("SLS") brings this Complaint against Defendant, United States of America, acting by and through the United States Army Corps of Engineers ("USACE" or "the Government"), and alleges as follows:

## NATURE OF THE ACTION

1.     This is a breach of contract matter between two parties that negotiated a July 15, 2022 settlement agreement (the "Settlement Agreement") to end litigation several years ago. Only one of those parties—SLS—has kept its word. The Government on the other hand has openly failed to perform specific obligations under the Settlement Agreement.

2.     The Government's breach is ongoing—it is refusing to pay SLS amounts owed as agreed upon by the parties under the Settlement Agreement. *See* Exhibit ("Ex.") 1 (July 15, 2022 Settlement Agreement).  Despite submitting a valid request for payment pursuant to the Settlement Agreement in September 2023, SLS has yet to receive a single cent from the Government.  Instead, the Government has repeatedly found excuses to delay and avoid processing the payment requests.

3.      After months of delay, when pressed by SLS to finally take action on the requests, the Government perpetuated its delay by purporting to restart its evaluation of SLS's payment request in a manner that is contrary to the terms of the Settlement Agreement. The Government has since confirmed that it does not intend to pay SLS at all even if it does pay SLS's subcontractors, and that any such payment would occur *after* much of the funds which could be used to make the requested interim payments will apparently be cancelled on September 30, 2024 (according to the Government).  In short, SLS has filed this Complaint in response to the Government's consistent and repeated failure to comply with the terms of the Settlement Agreement.

4.      The Settlement Agreement addressed eleven disputes that, at the time, were pending before the Armed Services Board of Contract Appeals ("ASBCA").  The ASBCA disputes centered around the Government's non-payment of amounts owed to SLS and additional construction activities that the Government insisted SLS perform *after* USACE fully terminated various construction contracts related to the border wall in May 2021 (the "Terminated Contracts") following the change in presidential administrations.

5.      In the year that followed the terminations, SLS and the Government disagreed about USACE's authority to order additional construction for contracts in a completely terminated status. Because a complete termination ceases all work under a contract and halts the standard invoicing process, performing additional work after a contract is completely terminated raises concerns regarding whether such activities are even authorized and risks non-payment for unauthorized acts. SLS raised these concerns in its challenges to USACE's demands, and ultimately the Settlement Agreement was the result, under which SLS agreed to drop the litigation in exchange for prompt payment on the additional work.

6.      SLS's concerns regarding the additional work and USACE's potential non-

payment for these activities were valid, as USACE has refused to pay for the additional work SLS performed. During the dispute that led to the settlement, SLS was particularly concerned that the Government was asking it to perform significant additional work not part of the Terminated Contracts at significant cost—work that the Government had already terminated in full. Moreover, the Government did not even promise to pay SLS for this additional work despite SLS's repeated requests for assurance. Instead, the Government made vague promises to consider the costs as part of the overall termination settlement process, leaving SLS to front the money on promise of payment at an uncertain date, even if the termination process took years to complete. Years later, and well into the fourth year following these terminations, the settlement process is still ongoing and the Government has never paid for this additional post-termination work.

7.    At the time of the Settlement Agreement, however, USACE was adamant that it would issue payment to SLS for the additional work. To resolve the disputes in 2021, SLS agreed that it would perform the additional work that USACE had demanded despite vehemently disagreeing with the Government's position that performing additional work post-termination was an enduring obligation of the contractor after the contracts were completely terminated. Agreeing to settle these meritorious claims was a substantial sacrifice for SLS, but one it was willing to make based on the promises that USACE made in the Settlement Agreement to pay for the work—promises USACE has now broken.

8.    In exchange for SLS's promises in the Settlement Agreement, the Government agreed that it would pay SLS for all of this additional work, and that it would do so in cash. The Government also explicitly agreed that it would make a cash payment for the costs of these disputed activities as well as pre-termination suspension costs for the months that SLS sat in stasis, between the time its contracts were suspended in January 2021 and ultimately terminated for convenience in May 2021.

9.    The Settlement Agreement provided that SLS would submit and receive one interim payment per contract *before* the end of the formal termination settlement process.  *See* Ex. 1 at 4. The Agreement also required that the interim payment be "in the form of an actual cash payment as opposed to a credit" applied to the final termination settlement figure. *Id.* The purpose of the interim payment was to provide cash flow to SLS during a period in which regular invoicing was stopped due to the termination. Acknowledging that USACE was asking SLS to perform additional work outside the scope of a typical termination, USACE expressly agreed to pay for that work so that SLS could receive cash flow that it could provide to its subcontractors performing this work.

10.    Accordingly, and consistent with the Settlement Agreement's terms, SLS completed the additional work USACE had demanded post-termination and then submitted a request to the Government for the interim cash payment owed on each contract in September 2023. The total amount of cash payments ultimately requested by SLS (to include cash owed on all Terminated Contracts as reflected in SLS's most recently updated submissions) was $18,024,069.07.

11.    To date, the Government has not made the requested payments to SLS and has indicated to SLS that it will not make such a payment to SLS, in breach of the plain terms of the Settlement Agreement.  Since the September 2023 submissions, USACE has consciously avoided rendering payment to SLS through obfuscation and by continually altering the format of submissions required for an interim payment to be made, a classic case of "shifting the goalposts." Such behavior is beneath any reasonable contracting party, let alone the federal government of the United States of America.

12.    In response to SLS's initial September 2023 interim payment submissions, the Government first requested that SLS provide additional forms for the payment, and even gave specific direction as to how to do so, which SLS promptly completed within 12 days of the

Government's request.

13.     Then, inexplicably, the Government seemingly sat on SLS's submissions for over *five months*, without ever reaching out to SLS or indicating that the Government would require more information from SLS in order to process the submissions. SLS therefore assumed, and reasonably so, that the Government was performing a review prior to processing the payment requests and would soon make the requested payments.

14.     This assumption proved wrong, as the Government appears to have been engaged in a concerted effort to delay any further payment to SLS for work executed pursuant to the Settlement Agreement. Months later, after several reminders from SLS, the Government finally communicated with SLS again in February 2024, but not to provide payment. Instead, the Government informed SLS that the forms it had completed, *per the contracting officer's directions*, were inadequate because of a new process and submissions format the Government was requiring SLS to follow.

15.     The Government then requested significantly *more* information from SLS regarding the requested payments, including detailed cost information from subcontractors, which takes significant time to gather. Notably, the cost information requested had already been provided by SLS and its subcontractors within each party's termination settlement proposal submitted in August 2022, some 18 months earlier. However, the Government insisted that same cost information previously provided be reorganized and then resubmitted again as part of SLS's interim payment submissions.

16.     USACE has never explained why it did not initially request this information in this format from SLS when it reviewed the interim payment submissions in September 2023. Nevertheless, SLS diligently and in good faith collected the requested information and submitted it to the Government in early June 2024. After patiently waiting for weeks, SLS requested USACE

provide a formal status update on its interim payment requests submitted a month prior.  Instead of providing a formal update, USACE abruptly announced that a new contracting officer would be taking over effective immediately, on July 10, 2024, who seemingly started anew on SLS's interim payment requests some 10 months after they were initially submitted.

17.     SLS has yet to receive a formal update from the Government about the status of its interim payment requests, but the Government has begun sending SLS and its subcontractors additional information requests regarding their Termination Settlement Proposals (TSP), also known as Standard Form 1436 ("SF 1436"), purportedly to determine a final settlement figure for each of the Terminated Contracts.  On July 10, 2024 USACE appeared to indicate in a letter that it would not make the required interim payments until it reached a final settlement determination for SLS and its subcontractors.  Such an action would obviously violate the Settlement Agreement, as it would negate any sort of interim payment in favor of final settlement. The Settlement Agreement requires an interim payment be issued prior to any final resolution of the termination settlement process.

18.     In a letter dated August 5, 2024, the Government confirmed that it will not make the interim payment requested by SLS until it has evaluated *all* costs submitted by SLS and its subcontractors in their TSPs, not just those costs identified in their interim payment requests.  In other words, the Government will not make the interim payment to SLS until it has effectively resolved the final termination settlement. This approach is inconsistent with the plain terms of the Settlement Agreement and defeats the entire purpose of the Settlement Agreement's interim payment process.  It deprives SLS of the benefit of the bargain it struck with the Government, and sadly indicates that the Government never intended to uphold its bargain under the Settlement Agreement with SLS.

19.     But the Government's duplicity did not end there.  The Government confirmed in

a later conversation that any payment it does make—after following this proposed process of evaluating *all* termination costs, inconsistent with the terms of the Settlement Agreement—will deliberately exclude SLS.  According to the Government, it will make payment to SLS's subcontractors because it wants to help them cover their costs, but does not want to help SLS.

20.    The Government is also taking the position that much of the funding available for the Terminated Contracts, including funding that could have been used for the interim payments, are cancelling on September 30.  As a result, the Government is seeking to de-obligate funds from the Terminated Contracts, which will make it all the more difficult for SLS to get paid under the Settlement Agreement.  The fact that the Government has delayed performance of its obligations under the Settlement Agreement for nearly a year while knowing it would be taking the position that much of the funding under the Terminated Contracts would be cancelled, is but further evidence that the Government never intended to comply with the Settlement Agreement in the first place.

21.    The Government's conduct cannot be permitted to stand. Under the terms of the Settlement Agreement, the Government is obligated to make these interim payments, and those payments are not dependent on a final analysis or negotiation of any SF 1436 and the larger termination settlement. SLS settled its disputes against the Government specifically because the Government agreed to make this necessary interim payment to SLS in cash to address real-time cash flow considerations for additional, out-of-scope work not provided for in any of the Terminated Contracts. SLS has financed the Government's entire termination process for the past 3.5 years by outlaying millions of dollars, both during the suspension period and for the additional work demanded by USACE post-termination, and done so *without any payment*; this interim payment is necessary and was intended to ensure that SLS finally received much-needed cash for activities it performed at the Government's insistence well over a year ago.

22.    In contrast to the Government, private enterprises like SLS do not have the luxury of being able to print more money to fund their obligations. SLS, like any government contractor, relies on consistent cash flows to operate its business, and the Government's outright refusal to comply with its payment obligations under the Settlement Agreement endangers the viability of commercial enterprises like SLS.

23.    The Settlement Agreement is a valid and enforceable contract, and the Government is required to abide by it. The Government is in breach of its obligations under the Settlement Agreement, and like any party, is responsible for the damages it has caused.

## PARTIES

24.    SLSCO, Ltd. is a Texas limited partnership, with its principal place of business at 6702 Broadway Street, Galveston, Texas 77554.

25.    The United States of America in this matter is acting through the Department of Defense ("DoD"), United States Army Corps of Engineers, 441 G Street NW, Washington, DC 20314.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over this action under the Tucker Act, which provides that the Court of Federal Claims has jurisdiction over claims against the United States founded upon "any express or implied contract with the United States." 28 U.S.C. § 1491(a). "A settlement agreement falls within [the Court of Federal Claims'] jurisdiction because litigation related to its alleged breach is nothing more than a suit to enforce a contract with the government." *Yu v. United States*, 150 Fed. Cl. 11, 16 (2020) (internal quotation marks and citation omitted).

## BACKGROUND

### A.    The Border Wall Contracts and the Terminations for Convenience

27.    Pursuant to the Trump Administration's border wall program, USACE awarded

SLS several firm-fixed-price construction contracts for barrier and infrastructure construction services at the southern border of the United States. The border between the United States and Mexico has drawn intense focus, both domestically and internationally, over the past few years for its prominent role in our national security. While the majority of the 2,000-miles-long southern border is covered by the Rio Grande River, the 700 miles of land border requires some other form of defense. Since 2005, the United States has added an additional 500 miles of wall and fencing, all requiring the work of public and private entities.

28.    These hundreds of miles of wall and fencing require a constant and tremendous effort in order to ensure operational and national security. For example, the maintenance costs alone on California's section of the border fence were approximately $9 million for each year preceding 2016. Along with maintaining the actual barriers, there are significant costs and efforts to maintain the associated roads, bridges, and lights along the fencing. Even still, individuals seeking to gain access create "human-sized holes" in these barriers around 550 times a year. The effort to maintain these vital structures requires consistent and harmonious working relationships between all the entities tasked with securing this border.

29.    And while the effort to maintain the southern border is always ongoing, in 2017 certain events accelerated the standard timetables and pressed work to be completed more quickly than ever before. After entering the White House in 2017, then-President Trump focused on securing the border and expanding the associated barriers, issuing a national emergency declaration in February 2019 declaring that the "situation at the southern border presents a border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."  Proclamation No. 9844, 84 Fed. Reg. 4949, 4949 (Feb. 15, 2019).  The two operative sections of the declaration empowered the Secretary of Defense and Secretaries of related departments to order additional troop capacity at the southern border and to "take all

appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked." *Id.* at 4949-50.

30.    The Government waived a number of environmental laws for select segments of the border projects in order to meet the pressing deadlines and respond to the national emergency. The April 2019 Department of Homeland Security ("DHS") Notice of Determination informed the public that 27 environmental laws would be waived for the Barrier Project, including the National Environmental Policy Act, the Endangered Species Act, the Federal Water Pollution Control Act, and the National Historic Preservation Act. The decision to waive these regulations greatly accelerated barrier project schedules because it removed the normally lengthy environmental reviews required under these waived laws.

31.    In the face of the political environment and the pressure for speed, SLS showed itself to be a stalwart and willing partner in ensuring mission success for these critical infrastructure projects, even in the face of danger and threats to safety.  It is well known that work on the border barriers presented a number of unique risks.  Bidders for and contractors on these projects consistently requested information from the Government for mitigation strategies against "hostile attacks," which ranged from protests that attempted to stop work to the possibility of lone-wolf terrorist attacks.  These issues, coupled with the death threats companies and individuals received for being tied to these politically charged situations, illustrate the significant cost that contractors endured to assist in these projects.

32.    SLS took on significant risks both to its safety and its reputation in bidding for and undertaking the complicated construction work that the contracts required in order to build a secure border barrier. SLS deployed significant amounts of money, employees, and resources to ensure that it was meeting all of the expedited deadlines that the prior administration set in order to construct the border barrier as quickly as possible. During the years of work that went into these

contracts, SLS expended tens of millions of dollars to meet these goals and the requisite construction requirements.

33.    These and other risks were priced into the Terminated Contracts. Because construction contracts for the DoD must be firm-fixed-price contracts, SLS could not submit and be reimbursed for its actual incurred costs on these projects. Rather, SLS had to price the work ahead of time and offer a firm-fixed-price bid figure, taking on the risk that it could lose money if its costs exceeded the price it bid. The Government agreed to SLS's proposed prices when it awarded SLS the contracts—and for Contract No. W912PP19C0018, the Government unilaterally set a price it determined to be fair and reasonable when the parties could not agree on the price following negotiations.

34.    However, in January 2021, after the change in presidential administrations, SLS and other border wall contractors received notices of suspension for their border wall contracts. These suspension notices informed SLS that it must immediately cease all activities at the worksites and await further instructions. SLS was forced to deal with the uncertainty of having to maintain enough staff and ready access to resources to return to work the moment the Government reinstated the contract—but with no idea of when or if the Government would order work to resume.

35.    After months of silence and no hint as to the Government's intentions, on May 1, 2021, USACE issued Notice of Termination for Convenience letters ("Notices"), informing SLS that its border wall contracts were being "terminated for the convenience of the government under Federal Acquisition Regulation (FAR) clause 52.249-2, 'Termination for Convenience of the Government.'" The Notices directed SLS to immediately "stop all work, make no further shipments, place no further orders relating to the contract, and terminate all subcontracts related to the terminated portion of the prime contract."

36.    USACE has taken the position that these Notices indicated that the Government had decided to classify these contracts as "complete" terminations instead of "partial" terminations, a decision that the Government believes permitted it to convert the Terminated Contracts from firm-fixed-price contracts to cost-reimbursement contracts. Declaring a "complete" termination under these circumstances and then treating the contracts as cost-reimbursable is a highly unusual choice, given that Congress has prohibited DoD's use of cost-reimbursement contracts for construction projects and that a majority of the work had already been completed and paid for.  The Government was also already getting beneficial use of the completed work in its mission of securing the border. Taking this novel approach required the contractor to look back and identify *all* of its costs (including subcontractor costs) over the life of the contract, classify those costs according to cost accounting rules not applicable to firm-fixed-price contracts, and then submit this certified cost information fully compliant with FAR Parts 49 and 31 to the Government. As discussed in more detail below, this decision (among others) would significantly extend the time it has taken to resolve the terminations.

B.    **The Government Requires Illegal Actions During Termination Process and SLS Files Lawsuit to Vindicate its Position**

37.    In the weeks immediately following the termination, SLS tried to obtain clarity from the Government as to what it understood to be SLS's obligations once the contracts were completely terminated. However, the Government provided conflicting directions and vague statements that made it difficult for SLS to determine what responsibilities or obligations it actually had to the Government.

38.    For example, USACE instructed SLS to submit any questions regarding the terminations on USACE's "ProjNet" portal, an internet-based communications tool. On May 14, 2021, SLS submitted questions to USACE to clarify the extent to which SLS should vacate the job sites and demobilize. Specifically, SLS asked: "Will the Government continue to pay 'standby

costs' for all personnel and equipment that remain on site until the Government issues direction for final close-out actions required by the Contractor?"

39.    SLS required an answer to this question (and others) to assess whether it would be compensated for keeping equipment and personnel on site, even if USACE later determined those personnel and equipment were not needed.

40.    USACE did not answer the question. USACE instead placed the risk on SLS, stating: "Any costs you deem allocable to the suspension or termination should be included in the termination settlement proposal. Termination costs will be audited and assessed by the Government in accordance with FAR Part 49 and FAR Part 31."

41.    As requested by the Government, SLS provided a list of various site conditions or issues that it felt must be identified to the contracting officer via written letter on May 21, 2021. Also as requested by government directives, SLS kept personnel and equipment available on site to assist with these issues if necessary. After 30 days without any communication or indication from the Government that its resources were still required, SLS began the process of demobilizing its resources from the project sites—which the Government had already directed SLS to do or left to SLS's sole discretion. Simultaneously, SLS vacated all government-owned lands that were used in conjunction with the contracts.

42.    In July 2021, more than 75 days after it notified SLS that its contracts were terminated completely and directed it to demobilize its resources, USACE belatedly issued requests for SLS to perform additional and substantial construction activities that it referred to as "make-safe" work.

43.    USACE cited to the termination for convenience clause that requires contractors to protect and preserve government property in their possession as the claimed authority to order the requested "make-safe" work. However, the scope and breadth of USACE's work requests went far

beyond protection and preservation of moveable property that remained in SLS's possession, such as excess government materials and equipment. Instead, USACE's position was that SLS was required to preserve and protect all government property to include real property, and therefore was required to protect and preserve the government's land and all of the construction work that was already complete or remained incomplete due to the termination. As a consequence of this purported responsibility, USACE asserted that SLS was therefore required to perform an indefinite amount of construction work until the Government determined, in its sole discretion, that the project sites were generally "safe and clean." This gave rise to USACE generating lengthy lists of "make safe" and "site cleanup" activities that it expected SLS to perform without any agreement as to the value of the work or timing and method of compensation.

44.    Despite the "make-safe" term, which does not appear in applicable government regulations, USACE required SLS to perform significant construction work, to include the completion of specific features of work that were actually terminated as part of the complete contract terminations ordered months earlier. Instead of reversing its previous decision and re-classifying these contracts as "partial terminations" to order the additional work, USACE insisted that SLS was obligated to perform this work as part of its apparently never-ending post-termination obligations to the Government. As a result, the Government directed SLS to expend substantial time and effort undertaking significant construction work, after its contracts had already been completely terminated.

45.    The list of required "make-safe" activities for the following job sites were as follows:

    a. El Paso C/D 11/16 Border Barrier Project (Task Order No. W50UW8-20-F-0010 under Contract No. W9126G-19-D-0021)

        i. Make rescue gates operational and secure

        ii. Grading and backfill of roads

        iii.  Install signage

    b.  El Paso 1 Border Barrier Project (Contract No. W912PP-19-C-0018)

        i.  Back-fill Trenches (fiber trenches, structural support, drainage trench)

        ii.  Remove exposed rebar and concrete forms

        iii.  Install flood gate

        iv.  Install signage

    c.  El Paso 2-2 and 8 Border Barrier Project (Task Order No. W50UW8-20-F-0002 under Contract No. W9126G-19-D-0021)

        i.  Install rockfall protection

        ii.  Back-fill Trenches (fiber trenches, structural support, drainage trench)

        iii.  Remove exposed rebar and concrete forms

        iv.  Block-off incomplete/unsafe road access

        v.  Install signage

    d.  El Paso 2-3 Border Barrier Project (Task Order No. W50UW8-20-F-0003 under Contract No. W9126G-19-D-0021)

        i.  Back-fill Trenches

        ii.  Install signage

    e.  Yuma 6 Barrier Project (Task Order No. W912PL-20-F-0010 under Contract No. W9126G-19-D-0021)

        i.  Block-off incomplete gate foundations

        ii.  Remove exposed rebar and concrete forms

        iii.  Install signage

        iv.  Place barriers and signage at retention pond

46.    During onsite meetings in 2021, the rationale USACE personnel provided to SLS for these additional work requests was that they were attempting to satisfy urgent operational requirements for their client, U.S. Customs and Border Protection ("CBP"), which were caused

when the Government hastily and haphazardly terminated these border barrier projects. This prevented USACE from "winding down" the projects in an orderly manner.  Further, USACE personnel explained that the contracting officer was directed to characterize the contract terminations as "complete" instead of "partial."  Had the contracting officer been able to do the latter, she would have required this additional work be performed as part of the partial contract scope that required completion after the notice of termination.  But under a complete termination, that was not an option.  It was clear to SLS that USACE personnel recognized that the additional work being requested was not within the scope of the Terminated Contracts, but they felt they had no other way to get the work done.

47.     During multiple site visits, USACE representatives failed to explain how any of the requested additional work was related to the protection and preservation of property in the contractor's possession, as required under the termination for convenience clause.

48.     With respect to the requested gate construction work, for example, USACE terminated the Contracts before SLS was scheduled to construct 42 gates at the ELP C-D job site, which under the original plans would have provided access to an irrigation canal along 17 miles of border. During the site visits the week of September 7, 2021, the contracting officer's representative described the additional work requested as "installing rebar, pouring concrete to complete the border wall (gate) foundation, installing hinges, hardware, and locking mechanisms, etc." In other words, the Government wanted SLS to resume construction work to fabricate and install all of the gates consistent with the contract design documents, despite the fact that USACE terminated this very same scope of work four months prior when it notified SLS that its contracts were terminated completely. When challenged with this point, USACE representatives conceded this work was not related to the "protection or preservation" of property in SLS's possession, stating, "We understand that [point] but that is what CBP wants done, these gates need to be fully

operational." Of course, the scope of work that the Government had already terminated, in full, months prior, required that SLS do exactly that: make the gates fully operational for CBP's mission needs.

49.    With respect to the grading and backfilling of roads, the contracting officer's representative explained to SLS that the reason for the requested road improvements was to enable CBP to travel at high speeds in the execution of their border protection mission. Again, this work was not related to the protection or preservation of property in SLS's possession, but instead was necessary to enable CBP to perform its mission. Although SLS recognizes the importance of safe roads for CBP's mission, it is also knows that CBP has active road maintenance contracts for this very purpose (SLS had previously bid on these contracts). Demanding that SLS perform additional work after its contracts had already been terminated was not the only solution available to the Government.

50.    Similarly, with respect to the backfilling of trenches around the work site, the contracting officer's representative indicated that SLS was being asked to do this work not because it was necessary for "protection or preservation" of property in SLS's possession, but so that CBP could execute off-road pursuits more easily.

51.    USACE also requested that SLS install a "wire mesh fabric" to prevent rocks from falling onto a temporary construction road below. The road was never intended to be a permanent road as made clear by the terms of the Terminated Contracts, and thus could have simply been blocked off at one end to "make it safe." However, during a site visit, USACE indicated that the road was now needed for CBP's operational use.

52.    During at least one site visit, USACE personnel directed SLS to install signage identifying danger related to erosion that occurred *after* the termination of the contracts in an area unrelated to work performed by SLS prior to the termination. While the contracting officer's

representative confirmed during the site visit that any hazard related to erosion was not the result of SLS's construction activities, and had only recently developed following significant rain events, USACE nevertheless requested that SLS install signage identifying the condition. Again, this had nothing to do with the "preservation and protection" of property in SLS's possession, but was simply additional work the government was (improperly) tacking on to a completely terminated contract because it was apparently unwilling to reclassify the contracts as "partially terminated."

53.    SLS consistently explained to the contracting officer and USACE representatives that all of these so-called "make-safe" activities that USACE directed SLS to perform fell outside the scope of the termination for convenience clause and the Terminated Contracts because (1) SLS was no longer in possession of the government-owned real property, to the extent it ever was in the first place, and (2) certain activities represent work that would be a continuation of the terminated contracts and not activities that are necessary for the preservation and protection of property in the contractor's possession.

54.    Despite SLS's explanations and documentation, USACE nevertheless continued to assert that SLS was responsible for performing all of these activities at its own cost, purportedly because the termination for convenience clause requires contractors to perform all activities that the contracting officer deems necessary.

55.    As a result of continued disagreements and unreasonable requests from the Government as to the work to be completed, SLS was forced to submit multiple claims in an effort to halt the Government's overreach on activities that would not fall under the scope of the Terminated Contracts.

56.    After the contracting officer denied its claims on these issues, SLS filed appeals at the ASBCA in late 2021, and then again in early 2022. The parties then engaged in active, intense litigation for months.

C.      The Settlement Agreement Between SLS and USACE

57.     During the pendency of the litigation, USACE took numerous steps that undermined SLS's competitive standing in upcoming procurements and negatively impacted SLS's business. USACE also threatened to issue negative past performance reviews based on SLS's refusal to perform work outside the scope of the Terminated Contracts. In light of the punitive steps taken by USACE, and in an effort to reach a resolution to what would be potentially protracted litigation, SLS agreed to settlement negotiations with USACE in July of 2022. The result of those settlement negotiations was the Settlement Agreement. *See* Ex. 1.

58.     The Settlement Agreement is a non-procurement contract between USACE and SLS that resolved pending litigation in exchange for prompt payment for the additional post-termination work that USACE demanded, work about which the parties disagreed under the Terminated Contracts.   The Settlement Agreement is not a modification to the terminated contracts, nor any other agreement covered by the Contract Disputes Act. The Settlement Agreement does not incorporate or reference the Contract Disputes Act, nor has any party characterized the Settlement Agreement as subject to the Contract Disputes Act. Rather, it is a standalone contract containing binding commitments from both parties, and duly signed by their authorized representatives—in the case of the United States, the contracting officer.

59.     SLS's interim payment requests are governed by the terms of the Settlement Agreement. Specifically, paragraph 3 of the agreement expressly provides for interim payments:

> 3. Following submittal of an acceptable final termination settlement proposal (TSP) for the Contracts, **SLS may submit an interim payment request for its actual direct costs associated with the make-safe, site clean-up, and material disposition, as well as the pre-termination suspension costs set forth in SLS's requests for equitable adjustment dated January 12, 2022.** USACE will review **those costs** and make an interim TSP payment to SLS for the portion of those costs that the TCO[1] in her reasonable sole discretion determines allowable and appropriate at that time. Only one interim

---

[1] TCO stands for termination contracting officer.

> payment for the work in paragraph 1 will be made. **The payment of these amounts shall be in the form of an actual cash payment as opposed to a credit.** Nothing in this Settlement Agreement prevents SLS from claiming additional costs associated with such activities in its final TSP. Nothing in this Settlement Agreement affects the final TSP process or that the ultimate amount of the TSP is subject to DCAA audit.

Ex. 1 at 4 (emphases added). This provision made clear that SLS had a contractual right pursuant to the Settlement Agreement to submit and receive one interim payment in cash for each Terminated Contract before the entire termination process had concluded.

60.    As the plain text of the Settlement Agreement says, USACE will review the interim payment request and the associated costs underlying the payment request and then "make an interim TSP payment to SLS for the portion of those costs that the TCO in her reasonable sole discretion determines allowable and appropriate at that time." The parties ensured that the contracting officer would be able to exercise her discretion when evaluating the interim-payment-based costs for which SLS is seeking an interim payment, but that discretion does not extend to unreasonable delays and Government inaction, nor does it permit violations of the duty of good faith and fair dealing.

**D.    SLS Performs Required Activities and Submits Interim Payment Request Per Settlement Agreement Requirements**

61.    Once the parties signed the Settlement Agreement, SLS diligently executed on all of the Government's additional, post-termination work for each of the Terminated Contracts. Beyond performing the post-termination construction activities identified above, SLS also performed numerous ad-hoc "site clean-up activities" that USACE placed on to-do lists every time its representatives visited the project sites, and SLS also coordinated hundreds of long-haul tractor trailer loads across multiple states to move government-owned materials from the project sites to designated government surplus processing facilities (i.e., "material disposition" efforts).

62.    Between December 2022 and May 2023, as all of the requested work on each contract was finished, the Government sent notices to SLS confirming in writing that "the make-

safe and cleanup activities necessary to effect the termination of the project are complete and accepted by the Government."

63.    Having received acknowledgement from the Government that all of the required work was done, and in accordance with the Settlement Agreement, SLS then submitted one interim payment request for each of the Terminated Contracts, covering the post-termination, additional work the Government had demanded. Between September 2, 2023, and September 10, 2023, SLS sent the Government a letter for each Terminated Contract titled "Interim Payment Request for Suspension and Termination Related Activities (i.e., Make Safe, Site Cleanup, and Material Disposition)," which included a request for payment and supporting documents. *See, e.g.*, Ex. 4 (El Paso 2 Segment 3, Design-Build Contract: Interim Payment Request for Suspension and Termination Related Activities, dated September 5, 2023).

64.    Each letter began: "In accordance with the Settlement Agreement (reference (a)), the purpose of this letter is to formally submit an interim payment request for the make-safe, site clean-up, material disposition, and pre-termination suspension costs." *Id.*    The letters then described how SLS had received confirmation from the Government that all of the additional, post-termination work required by the Settlement Agreement had been completed, the Government had acknowledged so in correspondence, and that SLS had therefore met the requirements to submit for one interim payment. *Id.*

65.    The Settlement Agreement did not include any requirements as to the information or details that SLS must include in its interim payment request in order to receive payment. Nor did it state that the Government had discretion to deem the form in which SLS made this interim payment request as insufficient or to require additional forms/details; the Settlement Agreement only stated that "USACE will review those costs and make an interim TSP payment to SLS for the portion of those costs that the TCO in her reasonable sole discretion determines allowable and

appropriate at that time." *See* Ex. 1 at 4. Nevertheless, SLS sought to work with USACE to provide information reasonably necessary to process the payments required under the Settlement Agreement.

**E.    The Government's Moving Target for Interim Payments**

66.    SLS reasonably expected that the Government would review these letters and the supporting documentation SLS submitted and then make the interim cash payment as required by the Settlement Agreement. Instead, the Government engaged in a series of unreasonable delay tactics that appear to have been designed to shift the goal posts, make SLS jump through additional, extra-contractual hoops, and ultimately delay and potentially entirely halt the Government's required payments to SLS under the Settlement Agreement.

67.    For example, on September 8, 2023, in response to SLS's September 6, 2023 interim payment request for Task Order No. W50UW820F0010, SLS received an email from USACE stating that the form of the interim payment requests was not correct and requiring that SLS complete the Standard Form 1440 Application for Partial Payment ("SF 1440") for each of SLS's interim payment requests. While the Settlement Agreement gave the contracting officer discretion to determine which costs are "allowable or appropriate," it does not state that the contracting officer can require changes to the format of the interim payment request.

68.    Following further discussion with SLS, contracting officer Kovar clarified via email on September 12, 2023, that the SF 1440 need only reflect the information necessary to support the payment amount specifically requested. Specifically, Ms. Kovar stated that "[f]or example, if you are requesting a partial payment of $1M, then you will fill out the form to support the $1M and provide the supporting documentation for those costs."

69.    SLS dutifully completed the SF 1440 forms for each contract in accordance with the contracting officer's instructions, submitting the signed 1440 forms on September 20, 2023,

and resubmitting its interim payment request for each of the Terminated Contracts on September 26, 2023, pursuant to still further government direction.  SLS understood its interim payment requests to be in process after that point, since SLS had completed all of the requirements for payment that USACE requested, SLS had engaged with the contracting officer to confirm the required format for submission and had complied, and SLS had met the conditions in the Settlement Agreement for payment.

70.    The Government then apparently sat on its hands for the next five months, before responding to SLS's submissions only to inform SLS that the forms it submitted as the contracting officer had directed were still inadequate.  The Government proceeded to impose extensive new requirements on SLS.

71.    Instead of processing SLS's requests during the intervening five months (during which SLS sent repeated reminders to the Government regarding the Settlement Agreement), the Government appears to have taken no steps to comply with the terms of the Settlement Agreement. Absurdly, rather than meet the terms of the binding Settlement Agreement, the Government indicated that its prior instructions regarding the SF 1440s were incorrect, and that the Government actually required significantly more detailed information to process SLS's payment requests, including a completed SF 1440 from *each* of SLS's subcontractors that also had to be certified by subcontractors of every tier in addition to being certified by SLS. This level of detail was not set out in the terms of the Settlement Agreement, the Government chose to not even address it during the intervening five-month period while SLS's requests for payment were pending, and only raised these concerns when SLS reasonably requested a status update on its payment requests after waiting for months.

72.    Remarkably, the Government already possessed the information that it was now requesting from SLS. SLS and its subcontractors had submitted the information as part of the

termination settlement proposal process, and that information had been in the Government's possession for months if not years at the time of the Government's request for additional information.

73.    Notwithstanding SLS's concerns regarding whether the Government even intended to comply with the Settlement Agreement, SLS proceeded to comply with the Government's latest request and provided the information in the format the Government desired so that SLS could receive the promised payments pursuant to the Settlement Agreement.  Understandably, it took SLS additional time to gather the information from its subcontractors in the format requested by the Government.  SLS submitted the updated forms for each contract on June 4, 2024, to supplement its previously-submitted interim payment requests from September 2023.

### F.    The Government Continues to Breach the Settlement Agreement

74.    Despite performing its obligations under the Settlement Agreement *and* submitting the agreed-upon requests for interim payment, SLS has still not received a single dollar from USACE. SLS has had to front millions of dollars for multiple years, including for all of the additional post-termination work the Government demanded, yet USACE has not paid. SLS still does not know when (or if) it will receive payment for work performed pursuant to the Settlement Agreement and in response to the payment requests submitted in accordance with the Settlement Agreement.

75.    Instead of receiving an update on the interim payments' status, SLS recently received disturbing news from USACE that appeared to ignore the interim payments entirely in favor of final settlement. The negotiated and accepted Settlement Agreement made clear that the interim payment would precede any final determinations in the TSP process. This approach to interim payments is in accord with terminations in general—the post-termination work that USACE demanded would require cash flow to perform such work, and it would make no sense for

contractors to expend costs to support termination efforts yet remain without payment while the termination plays out for *years*. SLS and USACE recognized that a significant amount of time would have passed between the last payment under the Terminated Contracts and when the contracts would be finally closed out. The negotiated interim payment for the additional work USACE demanded was the parties' jointly decided solution to address that extended delay and the considerable costs that SLS would be expected to incur while performing this work during the pendency of the termination.

76.    The timing for the interim payment to precede the final termination settlement process payment makes good policy sense as well: the interim payment serves to provide the contractor with a payment ahead of the end of the termination process so that the contractor is not left without any cash flow for work performed and costs incurred during the months or years it takes to settle the termination process. This is also why the Government has an entirely separate form for the overall termination process—the SF 1436—which is different from how the Government addresses interim payments.

77.    Therefore, SLS reasonably expected that the Government would abide by the Settlement Agreement and make the interim cash payment contemplated by the Settlement Agreement well before any discussion about, or progression into, final settlement of the Terminated Contracts. But this is not what has happened.

78.    USACE sent SLS a letter on July 10, 2024, purporting to be a "Ratification of Lower Tier Subcontractor." This letter did not make sense to SLS, as it appeared to be considering final payment actions for a single lower tier subcontractor *prior to* any interim payment being made (and prior to any negotiations occurring with respect to the termination settlement).

79.    That letter describes the government's "ratification" of a lower-tier subcontractor TSP, but then discusses payment "[b]ased on the current SF1440 dated June 10, 2024." The

mixing of references between the SF 1436 TSP process and the SF 1440 request for partial payment confuses two very separate and distinct termination processes and appears to ignore the terms of the Settlement Agreement.[2]

80.     Based on the July 10, 2024 letter, SLS became concerned that the Government was not going to abide by the terms of the Settlement Agreement and would instead delay the interim cash payment on pretextual reasons until it was no longer interim at all. SLS responded to the Government on July 15 and July 19 with letters voicing these concerns.

81.     The Government's intention to continue breaching the terms of the Settlement Agreement were made plain when the contracting officer confirmed in writing that it would not be abiding by the interim payment provision on August 5, 2024.  In its August 5 letter, the Government claims that SLS's request for the Government to immediately pay the interim cash payment in accordance with the Settlement Agreement is "incorrect," and that USACE must instead wait to make an interim payment until "after the TCO has reviewed the costs to determine allowability and appropriateness."  According to USACE, once the contracting officer conducts an "examination of each subcontractor's settlement proposal," the contracting officer will incorporate the allowable costs "into the Government's negotiation position with SLSCO without further discussion until SLSCO's TSP is negotiated."  And according to the contracting officer, "interim payments rely on the [contracting officer] determining which costs submitted on the SF-1440s are 'reasonable and appropriate,'" and doing so requires the contracting officer "reviewing the information provided on the SF-1436 as well as the accompanying supporting documentation

---

[2] The actual payment request at issue in the July 10, 2024 letter is an SF 1436 termination settlement proposal request from one of SLS's subcontractors, but USACE's discussion of the payment then references the separate SF 1440 interim payment request discussed above. These are two different government forms that are part of two separate processes: SLS's termination settlement process vs. SLS's contractually permitted one-time interim payment under the Settlement Agreement.

in said SF-1436."

82.    Not mincing words, USACE directly stated: "USACE will issue one interim payment once the second and third tier (if applicable) subcontractors' proposed settlement costs have been approved, ratified, or disapproved on each of SLSCO's TSPs."  In other words, USACE will not make an interim payment until the entire TSP review process is complete and the parties are already in negotiations regarding the final termination amount—effectively making the interim payments required by the Settlement Agreement "interim" in name only. It is impossible to reconcile these statements and actions with the Settlement Agreement from 2022 and USACE's action (or rather inaction) upon receipt of the payment requests nearly a year ago.

83.    Moreover, the decision to withhold the interim payment until the Government has analyzed *all* costs from the TSP is inconsistent with the terms of the Settlement Agreement.  The Settlement Agreement specifically requires the TCO analyze the costs *in SLS's interim payment requests*, and exercise reasonable discretion as to whether those costs are "allowable and appropriate."  *See* Ex. 1 at 4.  The Settlement Agreement clearly does not call for an analysis of all costs submitted in the TSP, nor does it give the TCO discretion to consider those costs.  *Id.*

84.    The Government went further, however.  In a follow-up telephone conversation to discuss USACE's position, the contracting officer further stated to SLS that not only did USACE plan to withhold payment until the TSP review is complete, but that USACE would then only make a so-called "interim payment" to SLS's subcontractors, and would deliberately *exclude* SLS.  *See* Ex. 2 (Aug. 8, 2024 Email).  USACE indicated on this call that it would follow this process because it wanted to help SLS's subcontractors that are small businesses and require cash flow—but not SLS.[3]  SLS sent a follow-up email confirming that it had understood the contracting officer

---

[3] USACE's concern for these subcontractors appears strikingly disingenuous, given that USACE has been delaying payment to *anyone*—small subcontractors or otherwise—on these contracts for

correctly, *see id.*, and in response, the contracting officer did not indicate that SLS had misunderstood how the Government intended to proceed, *see* Ex. 3 (Aug. 12, 2024 Email). Rather, the contracting officer emphasized that "USACE will proceed as outlined in the above subject letter" [dated August 5, 2024].  *See* Ex. 3.

85.    This is an extraordinary admission that USACE has no intention of making any interim payment to SLS, in direct breach of the Settlement Agreement. Payment—even to just SLS's subcontractors—once the TSP process is complete can hardly be considered an "interim" payment. Such an approach defeats the entire purpose of the interim payment process in the first place.

86.    Just recently, the Government has added a new roadblock to performance of its obligations under the Settlement Agreement.  The Government recently informed SLS that it is taking the position that much of the funding obligated under the Terminated Contracts will be cancelling on September 30, and the Government is seeking to de-obligate funds from at least one of the Terminated Contracts, which would essentially remove a source of funds that could be used to pay SLS.  This begs the question: if the Government's position has been that much of the funding would cancel on September 30, 2024 (a position with which SLS does not agree), why has the Government delayed so long in making the interim payments owed to SLS, which SLS submitted in September 2023?  In particular, why did the Government delay for *five months* after the initial payment requests were submitted before informing SLS that it needed additional information (which it already had) to process these payments?

87.    SLS deserves an answer.  The Government has had nearly a year to make an informed determination on the costs that SLS submitted as part of its interim payment request for

---

the last 3.5 years. USACE has had plenty of opportunities to remedy this state of affairs, but has repeatedly chosen not to.

each Terminated Contract. In that time, the contracting officer has failed to exercise her reasonable discretion to assess the costs submitted with the payment requests, and make the required payments. Further, under the clear terms of the Settlement Agreement, making this interim payment is not tied to a final analysis of any SF 1436, nor does it permit the Government to deliberately exclude SLS from payment.

88.    In so tying the Settlement-Agreement-required interim cash payment to the overall termination settlement process and the associated SF 1436 documents, the Government is consciously breaching the terms of Settlement Agreement and denying SLS the benefit of the bargain the parties struck in July 2022. By imposing artificial constraints on its ability to remit the interim payment to SLS, the Government has made clear that it never intended to issue any interim payment to SLS for the work done pursuant to the Settlement Agreement, representing a bad faith breach of the express agreement between the parties.

89.    The effect of this is that, practically speaking, the Government has tricked SLS into performing free work for its benefit—which flies not only in the face of the terms of the Settlement Agreement, but also violates any notion of common decency and mutual respect. Like any commercial enterprise, SLS must be able to deploy its capital for productive use in order to produce profit and otherwise be successful, and that was the purpose of the Settlement Agreement. Apparently unaware of this basic rule of economics, the Government's failure to provide SLS with any interim payments not only violates the Settlement Agreement, but it effectively creates a new *de facto* regime of financial regulations on government contractors whereby contractors must maintain sufficient levels of liquidity to execute the work of the Government without being paid— for *years*. If the Government wants to maintain a deep bench of private partners to collaborate with, this policy produces the opposite effect.

## II.   **THE GOVERNMENT BREACHED AN ENFORCEABLE AGREEMENT**

90.   By refusing to comply with the Settlement Agreement and the requirement to make one interim cash payment to SLS for each of the Terminated Contracts, the Government has breached the Settlement Agreement the parties reached on July 15, 2022. The Settlement Agreement is a valid contract: the parties reached a mutual understanding regarding the resolution of the parties' ASBCA disputes and SLS's entitlement to one interim cash payment, and the government agent who entered into the Settlement Agreement was authorized to do so. The Agreement was approved by a warranted contracting officer, Kim Kovar.

91.   The Settlement Agreement imposes obligations on both parties regarding the process for SLS receiving an interim cash payment. SLS agreed to perform the work that was in dispute in the ASBCA appeals, including "all make-safe, site clean-up, and material disposition work, as directed by the TCO, commencing immediately." Ex. 1 at 4.

92.   In response, the Government agreed that "SLS may submit an interim payment request for its **actual direct costs** associated with the make-safe, site clean-up, and material disposition, as well as the pre-termination suspension costs set forth in SLS's requests for equitable adjustment dated January 12, 2022." *Id.* (emphasis added).

93.   USACE would then "review **those costs** and make an interim TSP payment to SLS for the portion of those costs that the TCO in her reasonable sole discretion determines allowable and appropriate at that time." *Id.* (emphasis added).

94.   SLS fulfilled all of its obligations under the Settlement Agreement. As required by the Settlement Agreement, SLS performed all of the work that USACE required be performed for the Terminated Contracts.

95.   USACE has never disputed that SLS completed this work or questioned the quality or sufficiency of SLS's work. USACE sent SLS correspondence confirming that the additional

post-termination work had been completed in a satisfactory manner.

96.     Yet, just when SLS submitted for this one-time cash interim payment per Terminated Contract, the Government began a campaign of delay tactics and obfuscation, demanding additional paperwork in piecemeal fashion, refusing to consider SLS's requests and ignoring follow up, and most recently indicating that "interim" payments will not be made to SLS for many months if not years to come. That does not reflect the contractual bargain between the parties.

97.     The Government also made very clear that it would not make any payment to SLS until after assessing <u>all</u> costs submitted in the TSPs, which is an extraordinary volume of data. This is inconsistent with the terms of the Settlement Agreement, which requires the contracting officer to assess only the "actual direct costs" submitted *in the interim payment request*, which is less than 5% of the cost information in the TSPs.  In other words, USACE takes the position that it must also assess all costs incurred during the entire performance of the Terminated Contracts, including those that occurred prior to the suspension of the contracts, which is the vast majority of costs, before making a decision on the interim payment requests that only deal with the suspension and post-termination work, and which therefore represent only a small fraction of the total costs in the TSPs.  The TSPs, in total, are therefore irrelevant to the determination of whether the small subset of costs in the interim payment requests are "allowable and appropriate."

98.     The Government further clarified that, if it makes any payment, it will deliberately exclude SLS, making payment only to SLS's subcontractors.  And most recently, the Government has indicated that it will take the position that much of the funding under certain Terminated Contracts is cancelled and no longer available for use in the termination process—an event the Government has presumably seen coming since before SLS first submitted its interim payment request a year ago.

99.    Taken together, these actions demonstrate that the Government has never intended to comply with the terms of the Settlement Agreement—rather, it intended to enlist SLS to do extra-contractual work free of charge in order to accomplish its own agenda. The Government is in clear breach of the Settlement Agreement, and any claim that the Government needs more time to address SLS's requests will fail to satisfy the duty of good faith and fair dealing (at a minimum). Discovery regarding the Government's inaction following SLS's submissions in September 2023, and the contracting officer's failure to exercise reasonable discretion, may reveal additional evidence regarding the Government's approach and intention to fulfill its obligations under the Settlement Agreement.

100.    Importantly, the Government's failure to abide by the terms of the Settlement Agreement comes at a real cost. SLS has successfully completed millions of dollars of work pursuant to the terms of the Settlement Agreement, and is entitled to payment *now*—not later, and certainly not "someday" when the termination process (finally) concludes. The Government's failure to pay SLS for this work is a threat not only to SLS's ability to efficiently operate, but represents a larger threat to the government contracting industry as a whole.

## III.    THE GOVERNMENT VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BY INTENTIONALLY DEPRIVING SLS OF THE BENEFITS OF THE BARGAIN

101.    In proceeding with final termination settlement determinations before making the required interim cash payment, the Government has breached the implied covenant of good faith and fair dealing inherent in all contracts—including contracts with the Government. The implied duty of good faith and fair dealing prevents a party from committing acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value.

102.    Here, in abandoning the Settlement Agreement and forcing SLS to accept final termination settlement determinations before making the required one-time cash interim

payment—and indicating that the Government will exclude SLS from any payment it does make—the Government is denying SLS the benefit of its bargain.

103.    The Agreement has benefited USACE by ending the eleven disputes between the parties and obtaining the desired additional work from SLS. SLS always understood that it would have to carry its costs of performing the additional work until it was complete and SLS was able to submit for its interim cash payment.

104.    However, by forsaking the Settlement Agreement, USACE has destroyed SLS's expectation and contractual right to receive an interim cash payment of much-needed funds before the end of the lengthy termination settlement process. By proceeding to final termination settlement determinations now, the Government is in violation of its duty to perform its contractual obligations in good faith, and denying SLS the benefit of the bargain the parties struck in July 2022.

## COUNT I – BREACH OF CONTRACT

105.    Plaintiff incorporates all of the preceding paragraphs by reference as if the same were set forth fully herein.

106.    By reason of the actions described above, the Government materially breached the Settlement Agreement by failing to pay SLS the required interim cash payment, when no provision in the Settlement Agreement gives USACE the ability to do so, to the detriment of SLS.

107.    By reason of this breach, SLS has suffered damages in the amount of its requested interim cash payment—$18,024,069.07—and additional damages (including interest) due to the Government's delay and inaction that will be determined at trial.

## COUNT II – IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

108.    Plaintiff incorporates all of the preceding paragraphs by reference as if the same were set forth fully herein.

109.    By reason of the actions described above, the Government violated the implied

covenant of good faith and fair dealing by engaging in conduct to deny SLS the benefit of the parties' Agreement.

110.    By reason of this violation, SLS has suffered damages in the amount to be determined at trial.

## COUNT III – ATTORNEY'S FEES

111.    Plaintiff incorporates all of the preceding paragraphs by reference as if the same were set forth fully herein.

112.    The recovery of attorney's fees in actions against the United States is authorized by the Equal Access to Justice Act. *See* 28 U.S.C. § 2412.

113.    As a result of the Government's actions, SLS has been required to obtain legal counsel to bring this suit and is therefore entitled to reasonable and necessary attorney's fees that may be awarded by this Court.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Defendant and award the following relief:

A.    Enter judgment in Plaintiff's favor on Count I declaring that USACE breached the Settlement Agreement, and award Plaintiff damages in an amount to be determined at trial;

B.    Enter judgment in Plaintiff's favor on Count II declaring that USACE breached the implied covenant of good faith and fair dealing, and award Plaintiff damages in an amount to be determined at trial;

C.    Enter judgment in Plaintiff's favor on Count III, and award reasonable costs and attorney's fees for this suit; and

D.    Award Plaintiff such other relief as the Court deems appropriate.

Dated: August 16, 2024

Respectfully submitted,

*s/ Dean W. Baxtresser*

Dean W. Baxtresser (Attorney of Record)
Kyle R. Jefcoat
Genevieve P. Hoffman
W. Blake Page
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2110
Facsimile: (202) 637-2201
dean.baxtresser@lw.com

*Attorneys for SLSCO, Ltd.*